**Record No. 14-1040**

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

TIMOTHY OLSON,

*Plaintiff - Appellant,*

v.

MIDLAND FUNDING LLC;
MIDLAND CREDIT MANAGEMENT INCORPORATED;
LYONS DOUGHTY & VELDHUIS, P.C.,

*Defendants - Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
AT BALTIMORE

### OPENING BRIEF OF APPELLANT

E. David Hoskins
Max F. Brauer
THE LAW OFFICES OF
E. DAVID HOSKINS, LLC
16 E. Lombard Street, Suite 400
Baltimore, MD 21202
(410) 662-6500
davidhoskins@hoskinslaw.com
maxbrauer@hoskinslaw.com

*Counsel for Appellant*
*Timothy Olson*

UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT
DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Disclosures must be filed on behalf of all parties to a civil, agency, bankruptcy or mandamus case, except that a disclosure statement is **not** required from the United States, from an indigent party, or from a state or local government in a pro se case. In mandamus cases arising from a civil or bankruptcy action, all parties to the action in the district court are considered parties to the mandamus case.

Corporate defendants in a criminal or post-conviction case and corporate amici curiae are required to file disclosure statements.

If counsel is not a registered ECF filer and does not intend to file documents other than the required disclosure statement, counsel may file the disclosure statement in paper rather than electronic form. Counsel has a continuing duty to update this information.

No. 14-1040        Caption: Timothy Olson v. Midland Funding, LLC

Pursuant to FRAP 26.1 and Local Rule 26.1,

Timothy Olson
(name of party/amicus)


who is _____ Appellant _____, makes the following disclosure:
(appellant/appellee/petitioner/respondent/amicus/intervenor)


1.    Is party/amicus a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO


2.    Does party/amicus have any parent corporations?    ☐ YES ☑ NO
      If yes, identify all parent corporations, including grandparent and great-grandparent corporations:



3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?    ☐ YES ☑ NO
      If yes, identify all such owners:


10/28/2013 SCC                - 1 -

4.   Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?    ☐YES ☑NO
     If yes, identify entity and nature of interest:

5.   Is party a trade association? (amici curiae do not complete this question)    ☐YES ☑NO
     If yes, identify any publicly held member whose stock or equity value could be affected substantially by the outcome of the proceeding or whose claims the trade association is pursuing in a representative capacity, or state that there is no such member:

6.   Does this case arise out of a bankruptcy proceeding?    ☐YES ☑NO
     If yes, identify any trustee and the members of any creditors' committee:

Signature: _____    Date: ___January 15, 2014___

Counsel for: _Timothy Olson, Appellant_

## CERTIFICATE OF SERVICE
****************************
I certify that on ____1/15/2014____ the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

_____    ___January 15, 2014___
     (signature)                          (date)

- 2 -

# <u>TABLE OF CONTENTS</u>

Page

CORPORATE DISCLOSURE

JURISDICTIONAL STATEMENT ........................................................1

STATEMENT OF ISSUES PRESENTED FOR REVIEW ....................1

STATEMENT OF THE CASE.............................................................2

SUMMARY OF ARGUMENT ...........................................................13

ARGUMENT .....................................................................................17

   A. STANDARD OF REVIEW ........................................................17

   B. DISCUSSION OF ISSUES .......................................................18

     1.    TIMOTHY OLSON'S FDCPA CLAIMS ARE TIMELY BECAUSE THE STATUTE OF LIMITATIONS DID NOT BEGIN TO RUN UNTIL HE REQUESTED TO WAIVE SERVICE OF PROCESS ...................................................18

     2.    DEFENDANTS VIOLATED THE FDCPA BY COMMUNICATING WITH TIMOTHY OLSON AFTER DEFENDANTS KNEW THAT HE WAS REPRESENTED BY COUNSEL.......................................................................22

        a.    The "Animating Purpose" Test Adopted by the District Court Is Not Supported by the Plain Meaning of the FDCPA...............................................................24

        b.    The Privacy Notice Is a Communication in Connection with the Collection of a Debt under the "Animating Purpose" Test .........................................................29

     3.    DEFENDANTS VIOLATED THE MCDCA AND MCPA BY USING A STRATEGY AND POLICY OF SCATTERSHOT LITIGATION DESIGNED TO DECEIVE CONSUMERS ..............35

i

CONCLUSION .................................................................................................41

REQUEST FOR ORAL ARGUMENT ..................................................................41

CERTIFICATE OF COMPLIANCE......................................................................42

CERTIFICATE OF SERVICE .............................................................................43

ADDENDUM SETTING FORTH RELEVANT PORTIONS OF STATUES.......44

# TABLE OF AUTHORITIES

## CASES

Alston v. Cavalry Portfolio Servs., LLC,
  8:12-C 2013 WL 665036 (D. Md. Feb. 22, 2013)..........................................21

Avila v. Rubin,
  84 F.3d 222 (7th Cir. 1996) ..............................................................30

Bass v. E.I. DuPont de Nemours & Co.,
  324 F.3d 761 (4th Cir. 2003) ............................................................17

Boyce Motor Lines, Inc. v. U.S.,
  342 U.S. 337, 72 S. Ct. 329, 96 L. Ed. 367 (1952) ........................................31

Clark v. Absolute Collection Serv., Inc.,
  13-1151, 2014 WL 341943 (4th Cir. 2014)..............................................24, 25

Drennan v. Van Ru Credit Corp.,
  950 F. Supp. 858 (N.D. Ill. 1996).......................................................31

Ehrich v. RJM Acquisitions LLC,
  09 CIV. 2696BMC/RER, 2009 WL 4545179 (E.D.N.Y. Dec. 4, 2009).........21

FTC v. Colgate-Palmolive Co.,
  380 U.S. 374, 85 S. Ct. 1035, 13 L. Ed. 2d 904 (1965) ...................................31

Gammon v. GC Services,
  27 F.3d 1254 (7th Cir. 1994) ............................................................26

Gburek v. Litton Loan Serv.,
  614 F.3d 380 (7th Cir. 2010) ....................................................23, 29, 30

Grden v. Leikin Ingber & Winters, PC,
  643 F.3d 169 (6th Cir. 2011) .................................................. 23, 29, 30

Hernandez v. Midland Credit Management, Inc.,
  04 C 7844, 2006 WL 695451 (N.D. Ill. Mar. 14, 2006)...................................34

Johnson v. Brock & Scott, PLLC,
	No. 5:11-CV-474-F, 2012 WL 4483916 (E.D. N.C. 2012) ...........................29

Johnson v. Riddle,
	305 F.3d 1107 (10th Cir. 2002) ......................................................................19

Kamps v. Midland Funding LLC,
	2:12-c 2013 WL 622505 (N.D. Ala. Feb. 19, 2013) .......................................39

Kouabo v. Chevy Chase Bank, F.S.B.,
	336 F. Supp. 2d 471 (D. Md. 2004)...................................................................36

Kuria v. Palisades Acquisition XVI, LLC,
	752 F. Supp. 2d 1293 (N.D. Ga. 2010)..............................................................39

Lamie v. U.S. Tr.,
	540 U.S. 526 (2004)...........................................................................................24

Malik v. Unifund CCR Partners,
	C09-1389 MJP, 2009 WL 5197820 (W.D. Wash. Dec. 22, 2009)..................21

McDermott v. Randall S. Miller & Associates, P.C.,
	835 F. Supp. 2d 362 (E.D. Mich. 2011) ....................................................23, 30

Mello v. Great Seneca Finance Corp.,
	526 F. Supp. 2d 1020 (C.D. Cal. 2007)............................................................39

Midland Funding LLC v. Brent,
	644 F. Supp. 2d 961 (N.D. Ohio 2009) ............................................................38

Monroe v. City of Charlottesville, Va.,
	579 F.3d 380 (4th Cir. 2009) ............................................................................17

Penn v. Cumberland,
	883 F. Supp. 2d 581 (E.D. Va. 2012) ...............................................................23

Robinson v. Sherman Fin. Group, LLC,
	2:12-c, 2013 WL 1249567 (E.D. Tenn. March 27, 2013)................................40

iv

Romine v. Diversified Collection Services, Inc.,
    155 F.3d 1142 (9th Cir. 1998) .........................................................................35

Rosenau v. Unifund Corp.,
    539 F.3d 218 (3d Cir. 2008) ...........................................................................31

Russello v. United States,
    464 U.S. 16, 104 S. Ct. 296, 78 L. Ed. 2d 17 (1983) .....................................25

Samuels v. Midland Funding, LLC,
    12-0490-W, 2013 WL 466386 (S.D. Ala. Feb. 7, 2013)..................................40

Simmons v. Portfolio Recovery Associates,
    3:11-c, 2012 WL 222935 (E.D. Tenn. Jan. 25, 2012) ....................................40

Spencer v. Hendersen-Webb, Inc.,
    81 F. Supp. 2d 582 (D.Md.1999).....................................................................36

Sprinkle v. SB&C, Ltd.,
    472 F. Supp. 2d 1235 (W.D. Wash. 2006) .....................................................26

Stone v. Instrumental Laboratories Co.,
    591 F.3d 239 (4th Cir. 2009) ...........................................................................17

Stricklin v. Jefferson Capital Systems, LLC,
    11-c, 2011 WL 5325735 (S.D. Ill. Nov. 3, 2011)...........................................33

Tucker v. Mann Bracken, LLC,
    No. 08-1677, 2009 WL 151669 (M.D.Pa. Jan.21, 2009) ...............................21

United States v. National Finance Services, Inc.,
    98 F.3d 131 (4th Cir. 1996) .............................................................................26

Valdez v. Capital Management Services, LP,
    CIV. A. B:09-246, 2010 WL 4643272 at*11 (S.D. Tex. Nov. 16, 2010) .......23

Vinson v. Midland Funding, LLC,
    2:12-C 2013 WL 625111 (N.D. Ala. Feb. 20, 2013)......................................40

## STATUTES

15 U.S.C. §§ 1692 et seq...............................................................................1

15 U.S.C. § 1692a(3) ....................................................................................2

15 U.S.C. § 1692a(5) ....................................................................................2

15 U.S.C. § 1692a(6) ....................................................................................3

15 U.S.C. § 1692c(a) ..................................................................................25

15 U.S.C. § 1692c(a)(2) ..........................................................14, 15, 22, 24, 25

15 U.S.C. § 1692(e) ............................................................................25, 26

15 U.S.C. § 1692g .......................................................................................25

15 U.S.C. § 1692g(e) ..........................................................................16, 25

15 U.S.C. § 1692k(d) ..........................................................................13, 14

15 U.S.C.A. § 6801 et seq .........................................................................25

28 U.S.C. § 1291 ..........................................................................................1

28 U.S.C. § 1331 ..........................................................................................1


Md. Code Ann., Com. Law § 14-201(c) ....................................................2, 3

Md. Code Ann., Com. Law § 13-301 ........................................................36

Md. Code Ann., Com. Law § 14-201 et seq ...............................................1

Md. Code Ann., Com. Law § 13-101, et seq .............................................1

Md. Code Ann., Com. Law § 14-201(b) & (d)...............................3, 4, 7, 8, 9

Md. Code Ann., Com. Law § 14-202(8).....................................................35

Md. Cts. & Jud. Proc. Code Ann. § 5-101 ................................................35

Md. Cts. & Jud. Proc. Code Ann. § 6-201(a) ............................................18

## RULES

F. R. Civ. P. 12(B)(6)................................................................................17

## JURISDICTIONAL STATEMENT

This appeal is taken from an order issued by the Honorable Catherine C. Blake of the District of Maryland. The Amended Complaint filed by the Plaintiff alleged violations of the Fair Debt Collection Practices Act ("FDCPA"), 15 U.S.C. §§ 1692 <u>et</u> <u>seq</u>., the Maryland Consumer Debt Collection Act ("MCDCA"), Md. Code Ann., Com. Law §§ 14-201 <u>et</u> <u>seq</u>., and the Maryland Consumer Protection Act ("MCPA"), Md. Code Ann., Com. Law §§ 13-101, <u>et</u> <u>seq</u>. The basis for the District Court's subject matter jurisdiction is federal question jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1692, <u>et</u> <u>seq</u>.

The basis for appellate jurisdiction is 28 U.S.C. § 1291. A final appealable order was issued on December 18, 2013. JA 96. Plaintiff filed a timely Notice of Appeal on January 13, 2014. JA 97.

## STATEMENT OF ISSUES PRESENTED FOR REVIEW

1.      Does the one-year statute of limitations applicable to FDCPA claims not begin to run until the consumer is served with process requiring appearance at a legally permissible venue?

2.      Did the Defendants violate the FDCPA by sending the Plaintiff a Privacy Notice that directed Plaintiff to a website seeking an online payment after Defendants knew he was represented by an attorney with respect to the subject debt and had knowledge of such attorney's name and address?

3.      Did the allegations of deceptive conduct on the part of the Defendants contained in the Amended Complaint state plausible claims under the MCDCA and CPA?

## STATEMENT OF THE CASE

The original lawsuit in this case was filed on May 20, 2013, and removed to the United States District Court of Maryland on June 27, 2013. JA 2, 86. An Amended Complaint was filed on July 29, 2013. JA 3, 5-47.

The Amended Complaint alleges that Mr. Olson is a "consumer" within the meaning of 15 U.S.C. § 1692a(3), and the debt subject to this dispute is a "debt" as that term is defined by 15 U.S.C. § 1692a(5) because it arises from credit card purchases made for personal, family or household purposes, such as purchasing essentials such as groceries, paying bills, and buying gasoline for his personal vehicle. JA 9 at ¶ 14; JA 19-20 at ¶ ¶ 47-49. Mr. Olson did not use the card for any business related expenses or purposes. Id. For the same reason, the subject debt is also a "consumer transaction" as that term is defined by Md. Code Ann., Com. Law § 14-201(c). Id.

Defendant Midland Funding, LLC (hereinafter "Midland") is a debt collector that purchases debts owed by consumers after the debts have gone into default and attempts to collect the balance owed on these debts. JA 9 at ¶ 15. In fact, Midland retained counsel to file in excess of 7,625 lawsuits in the state

District Court of Maryland during 2012 alone. Id. Midland claims to have no employees and conducts many of its debt collecting activities through an agent, Defendant Midland Credit Management, Inc. ("MCM"). JA 10 at ¶ 16. MCM is also a company engaged in the business of collecting debts alleged to be due another, and uses the United States Mail in furtherance of its collection of debts alleged to be due another. Id. at ¶ 17.

Midland and MCM hired Defendant Lyons, Doughty & Veldhuis, P.C. ("Lyons") to collect a debt allegedly owed by Mr. Olson to Chase Bank USA, N.A. JA 10 at ¶ 18. Lyons is a company engaged in the business of collecting debts alleged to be due another in Maryland. Id. at ¶ 19. During 2012, Nathan Willner, Esq., the attorney who filed the complaint against Mr. Olson, also filed 11,153 complaints in Maryland, many on behalf of Midland. Id.

Defendants are "debt collectors" within the meaning of 15 U.S.C. § 1692a(6). Midland is not a creditor of Mr. Olson, but rather is a debt buyer attempting to collect a consumer debt in default that it alleges Mr. Olson owes. See JA 10-11 at ¶ 20. In addition, Defendants acted as a "collector" and "person" as those terms are defined by Md. Code Ann., Com. Law, §§ 14-201(b) & (d) of the MCDCA. JA 11 at ¶ 21.

Debt purchases occur only after the original creditor has charged off the account from its books rather than outsource the collection or pursue the collection

themselves. Thus, when a debt buyer is involved, the original creditor has already decided that the account is not worth pursuing, which is why the accounts are sold for pennies on the dollar. Once an account is sold to a debt buyer, the original creditor can obtain a tax write-off for the difference between the charge-off amount of the account and the pennies on the dollar received from a debt buyer. JA 13 at ¶ 32.

Because original creditors no longer have an interest in these accounts, Midland and other debt buyers frequently lack the documentation to prove the debt and prove their ownership of the debt. JA 13-14 at ¶ 33. Once the original creditor sells the account for pennies on the dollar, it does not want to be bothered with it again because it no longer has any financial interest in the account. For this reason, almost every agreement between the original creditor and the initial debt buyer purchaser (and between the original debt buyer purchaser and each subsequent assignee) is made without representations and warranties, and without recourse. Id.

Debt buyers including Midland have adopted a business model, pursuant to which they buy large numbers of charged off consumer accounts for pennies on the dollar and then engage in a pattern and practice of scattershot litigation to collect debts by filing thousands of lawsuits without first conducting a proper investigation into whether a legal basis exists for pursuing a claim and without ever obtaining, or intending to obtain, admissible evidence of the existence or amount

4

of such debt. JA 14 at ¶ 34.

This approach includes filing lawsuits with sworn affidavits containing false, deceptive, and misleading statements by individuals without the requisite personal knowledge. These affidavits are executed without reviewing the original creditor's records. In a consent judgment obtained against Midland by the Minnesota Office of the Attorney General, Midland admitted that MCM employees signed hundreds of affidavits a day and falsely attested to have personal knowledge of their content, including the validity of the debt, the amount of the debt, ownership of the debt, and/or documents giving rise to the debt. The employee did not have this knowledge and did not read the affidavit he or she signed. JA 14 at ¶ 35.

Also according to the Minnesota OAG, Midland's collection actions included affidavits in which a notary -- a quasi-judicial officer -- falsely stated that she witnessed an MCM employee or agent sign an affidavit under oath and penalties of perjury. These affidavits were then used to prove to the court certain facts, such as the amount owed by the consumer, that the consumer did not answer the lawsuit, or that an individual was served with legal papers. JA 15 at ¶ 36. In addition, MCM filed affidavits to support a claim that Midland owned the debt, or had a contractual obligation with an individual, even though the underlying documentation filed with the affidavit did not support Midland's ownership or the existence of a contract. JA 15 at ¶ 37.

Under this approach cases are all too often: 1) filed against a person who is not the debtor, 2) filed outside the applicable statute of limitations; 3) filed in an improper venue, and 4) filed on a debt that has been previously extinguished through payment or otherwise. JA 15 at ¶ 38. The purpose of this system is to obtain default judgments against consumers or coerce settlements by deceiving consumers into believing that debt buyers such as Midland have legal recourse to collect the debt. JA 15 at ¶ 39.

Midland applies this system to filing lawsuits in Maryland. In the state District Court of Maryland, a streamlined process exists under Rule 3-306 for obtaining a judgment based upon an affidavit. JA 12-13 at ¶¶ 30, 31. The Court of Appeals of Maryland concluded that the overall lack of proof in debt buyer cases often leads to dubious judgments entered by affidavit, and on September 8, 2011, made major changes to Rule 3-306. In the words of the Hon. Alan Wilner in his report to the Maryland Court of Appeals:

> The problem, which has been well documented by judges, the few attorneys who represent debtors, and the Commissioner of Financial Regulation, is that the [debt buyer] plaintiff often has insufficient reliable documentation regarding the debt or the debtor and, had the debtor challenged the action, he or she would have prevailed. In many instances, when a challenge is presented, the case is dismissed or judgment is denied. In thousands of instances, however, there is no challenge, and judgment is entered by default.

JA 16 at ¶ 41.

The Reporter's note accompanying the 171st Report explains that the

changes to Rule 3-306 were necessary because of problems with cases filed by debt buyers, including:

> failure of the [debt buyer] to be licensed, the wrong party being named as plaintiff, filing after the statute of limitations period has run, lack of personal knowledge by the affiant, lack of supporting documentation containing sufficient detail as to liability and damages, failure of the [debt buyer] to prove it owns the debt, and incorrect identification of the amount claimed.

JA 17 at ¶ 43.

The amendments to Rule 3-306 apply to new complaints filed after January 1, 2012. JA 17-19 at ¶ 44. Previous requirements were reaffirmed including that the affidavit: (1) be made on personal knowledge; (2) set forth such facts as would be admissible in evidence; (3) show affirmatively that the affiant is competent to testify to the matters stated in the affidavit. See id. The thrust of the amendments required debt buyers such as Midland to fill out a checklist and attach to their complaint each item on the list. Id. The evidentiary checklist put in place by these amendments was intended to aid consumers, practitioners, and judges in evaluating cases brought through Midland's and other debt buyer's pattern and practice of deceptive, scattershot litigation. JA 19 at ¶ 45.

The Amended Complaint alleges that Defendants attempted to collect a debt by filing a lawsuit against Plaintiff using false, deceptive, misleading, unfair and unconscionable tactics and representations. JA 19 at ¶ 47. On or about December 15, 2010, Midland filed a complaint seeking a judgment in the amount of

$3,589.18 against Mr. Olson for allegedly failing to pay a debt owed to Chase Bank USA, N.A. This lawsuit was served on Plaintiff until August 22, <u>2012</u>, when he appeared in District Court in Baltimore City and acknowledged that he was prepared to proceed to trial, thereby waiving any defense based upon improper service. JA 19 at ¶ 47. Mr. Olson alleges that he does not owe this debt to Midland because Midland does not have legal recourse to collect the debt and misrepresented its standing in the complaint. JA 20 at ¶ 50.

In support of the claim of ownership of the subject debt, Midland filed a single Bill of Sale. <u>Id.</u> at ¶ 51; JA 58. The "Bill of Sale" attached to the lawsuit fails to mention Mr. Olson or his alleged account anywhere in the document. JA 20 at ¶ 52; JA 64. In addition, the Bill of Sale is a fragment of a larger document because it references a "Credit Card Purchase Agreement" and "Exhibit 1" not contained in the complaint, Midland did not provide the general terms of the Bill of Sale. <u>Id</u>. The document also fails to establish that any account allegedly relating to Plaintiff was included in these additional documents. <u>Id</u>.

The bill of sale filed with the collection complaint stated that whatever was sold was sold "without recourse except as stated in the Credit Card Account Purchase Agreement to which this is an Exhibit." <u>Id</u>.; JA 64. Upon information and belief based upon a review of language found in similar agreements, the Credit Card Account Purchase Agreement actually specifies that no representations or

warranties are provided by the seller. JA 23 at ¶ 59.

The collection lawsuit also included an "Affidavit of Carina Bowman." JA 21 at ¶ 53; JA 62-63. The affidavit did not assert that Carina Bowman had personal knowledge about Chase Bank USA, N.A., Midland, or the debt. Id. Rather, she only had knowledge of the account records of MCM. Id. Carina Bowman was not an employee of the original creditor and could not have personal knowledge of the procedures under which the original creditor created its records. JA 22 at ¶ 55. Additionally, based upon the consent judgment obtained against Midland by the Minnesota Office of the Attorney General, Carina Bowman did not review the records of the original creditor, Chase Bank USA, N.A., before signing the affidavit. JA 21-22 at ¶ 54.

Ms. Bowman actually knew nothing about the debt. The affidavit was not based on the business records of Chase Bank USA, N.A. JA 22 at ¶ 55. The collection lawsuit failed to include any documents actually referencing Mr. Olson from the alleged original creditor. JA 22 at ¶ 57.

Midland filed the action against Mr. Olson without meaningful attorney involvement because during 2012, Midland retained counsel to file about 10,786 lawsuits in the state District Court of Maryland. Nathan Willner, the attorney who signed the complaint filed by Midland against Mr. Olson, also signed complaints and was the attorney of record for approximately 11,668 cases during 2012,

including approximately 1,893 other complaints filed the same month as the complaint filed against Mr. Olson. Id.

By basing its claim on these incomplete and unauthenticated hearsay documents and accompanying false affidavit, Midland sued Mr. Olson with the hope of obtaining a default judgment when it knew or should have known that it did not possess the evidence necessary to support its claim. JA 23 at ¶ 60.

Lyons further engaged in unfair and deceptive conduct in the manner in which it litigated the case. JA 23 at ¶ 62. The original collection action was filed in the District Court of Maryland for St. Mary's County. JA 23-24 at ¶ 63. Mr. Olson discovered the lawsuit on the public Maryland Judiciary Case Search in December 2010 at a time when he was living in Baltimore and, in early January 2011, phoned Lyons to discuss the suit and demand that the lawsuit be served upon him so that he could discover its contents and fight the claims made against him. JA 24 at ¶ 64. In mid-January 2011, Mr. Olson phoned Lyons with the same request and demanded to speak with Nathan Willner, Esq. JA 24 at ¶ 65. His request to speak with Mr. Willner was denied. Id.

On March 9, 2011, Mr. Olson sent a letter to Lyons that included his current Baltimore address and indicated his intent to appear in court. JA 24 at ¶ 66; JA 46. Plaintiff awaited a summons at his current Baltimore address, but no summons came. Id. Instead, on March 28, 2011, Lyons filed an updated interest worksheet

with the District Court increasing the amount demanded. JA 24 at ¶ 67.

On September 10, 2011, Mr. Olson sent an email to Nathan Willner, Esq. requesting that Lyons correct his address and properly serve him immediately, but no service was attempted. JA 24 at ¶ 68. Instead, on November 21, 2011, Lyons filed an updated interest worksheet with the court increasing the amount demanded. JA 24 at ¶ 69.

On January 11, 2012, Mr. Olson emailed Nathan Willner, Esq. demanding that the case be moved from St. Mary's County to Baltimore City, where he was living. JA 24 at ¶ 70. Nonetheless, on March 9, 2012, Lyons attempted to affect service against Mr. Olson by serving someone alleged by the process server to be Mr. Olson's roommate, despite the fact that Mr. Olson was not living in St. Mary's County at the time. See JA 25 at ¶ 71. This resulted in Midland's case being placed for affidavit judgment, which was subsequently denied. Id. Then, on March 19, 2012, Lyons filed another updated interest worksheet with the court increasing the amount demanded. JA 25 at ¶ 72.

On April 4, 2012, Mr. Olson wrote a letter to the St. Mary's County District Court and Lyons to the attention of Nathan Willner, Esq. requesting a change in venue to Baltimore City. JA 25 at ¶ 73. On April 9, 2012, Lyons filed a consent motion to transfer venue to Baltimore City and the court subsequently transferred the case to Baltimore City. Id. However, by the time the case was scheduled for

trial, Mr. Olson had moved to Calvert County for work. JA 25 at ¶ 74.

Nonetheless, on August 22, 2012, Mr. Olson appeared for the trial of Midland's claim on the subject debt. JA 25 at ¶ 75. At trial no witness from Midland appeared and Nathan Willner, Esq. moved to strike service and to change venue in order to prevent the case from proceeding on that date. <u>Id</u>. These motions were made over Mr. Olson's objection and request to the District Court that he wanted his case heard that day. <u>Id</u>. The District Court subsequently granted the motions, and the case was transferred to Calvert County, notwithstanding that by requesting that the trial occur on August 22, 2012, Mr. Olson had waived any defense based upon improper venue. <u>Id</u>.

Mr. Olson has not been served with Midland's lawsuit since service was struck in August, 2012. JA 26 at ¶ 76. Defendants' conduct of failing to properly serve the complaint while at the same time filing copies of updated interest worksheets was intended to harass Mr. Olson into voluntarily settling the case in order to keep the amount of any potential judgment from growing. JA 26 at ¶ 77.

Finally, the Defendants communicated with Mr. Olson after they had learned that he was represented by undersigned counsel. Prior to March 25, 2013, Lyons advised Midland and MCM that Mr. Olson was represented by undersigned counsel. JA 26-27 at ¶¶ 80-81. Despite such knowledge, MCM communicated directly with Mr. Olson on May 8, 2013, by sending him a Privacy Notice. <u>Id</u>. The

Privacy Notice explained that MCM and Midland may disclose Mr. Olson's "nonpublic personal information" as part of its activities "in servicing or managing your account(s) in the ordinary course of our business." JA 42-43.

The Privacy Notice also directs consumers to visit www.mcmprivacy.com. This webpage directs consumers to call MCM with any questions and provides a link to allow consumers to "Make a Payment" online. JA 44. In addition to repeating the language from the mailed notice verbatim, the online Privacy Notice includes disclosures required by state law and the following disclosure: "Please understand that this is a communication from a debt collector. This is an attempt to collect a debt. Any information obtained will be used for that purpose." JA 47.

After removing the case to federal court, all Defendants moved to dismiss the amended complaint. JA 48-52; 53-82. On December 18, 2013, the District Court issued a memorandum opinion, JA 83-95, and granted the motions, JA 96. A timely notice of appeal was filed on January 13, 2014. JA 97-98.

## **SUMMARY OF ARGUMENT**

First, under the FDCPA, "[a]n action to enforce [the Act] ... may be brought ... within one year from the date on which the violation occurs." 15 U.S.C. § 1692k(d). This limitations period is measured from the date of the Defendants' last opportunity to comply with the act. When the Plaintiff's FDCPA claim arises from the instigation of a debt collection suit, no violation occurs within the meaning of §

13

1692k(d), until the plaintiff has been served because a debt collector can always dismiss the lawsuit and comply with the act prior to service. If the violation was measured from the filing date of the lawsuit, debt collectors would have an incentive to withhold service — and thus the consumer's discovery of the lawsuit — in order to run out the clock on the FDCPA's one year statute of limitations.

Nothing in the language of the FDCPA suggests that the statute of limitations runs from the first possible violation and encompasses all later-occurring and distinct violations of the Act. Rather, the Act states that a plaintiff may file an action for any violation of the Act which occurs within one year of filing the complaint.

Mr. Olson's FDCPA claims should not have been dismissed because he still has not been served with a debt collection lawsuit brought in the proper venue. Mr. Olson's claim in this case was not complete at the earliest until he attempted to waive improper service on August 22, 2012, because up to that point, Defendants could have amended their debt collection lawsuit or voluntarily dismissed it or unilaterally moved to transfer it to another county so as not to commit a violation of the FDCPA. There is no dispute that Mr. Olson filed his FDCPA claims within one year of that date.

Second, under 15 U.S.C. § 1692c(a)(2), after a debt collector knows that the consumer is represented by an attorney "with regard to the subject debt," the debt

collector shall not "communicate with a consumer in connection with the collection" of the debt. Once a collector has learned that the consumer is represented by an attorney, the collector must deal exclusively with the attorney and may not contact the consumer for any reason. The Amended Complaint adequately alleges that MCM violated 15 U.S.C. § 1692c(a)(2) when it sent Mr. Olson a Privacy Notice that vaguely stated that Mr. Olson's private information would be disclosed to third parties and directed Mr. Olson to a website that sought an online payment after Defendants knew he was represented by an attorney with respect to the subject debt and had knowledge of such attorney's name and address.

The District Court erred when it dismissed this claim by too narrowly focusing on whether the animating purpose of the communication was to induce payment and whether the purpose and context of the notice connected it with debt collection. These factors find no support in the plain language of 15 U.S.C. § 1692c(a)(2) which unambiguously identifies the circumstances when "a debt collector may not communicate with a consumer in connection with the collection of any debt." Since the relationship between MCM and Mr. Olson was that of debt collector and alleged debtor, the privacy notice was a communication in connection with debt collection. Had Congress intended to so limit the protections provided by § 1692c(a)(2) it could have done so by using the same limiting

language it included in 15 U.S.C. § 1692g(e).

Even if the District Court properly used a three factor test, the privacy notice met all of these factors because it vaguely stated that Mr. Olson's private information would be disclosed to third parties, and provided a link to a webpage that requested that Mr. Olson "make a payment." At the very least, the application of this test is a question of fact for a jury to resolve.

Finally, the Amended Complaint also alleged claims under the MCDCA and MCPA which were timely under the applicable three-year statute of limitations. The MCDCA prohibits collectors from attempting to enforce a right with actual knowledge or with reckless disregard as to the falsity of the existence of the right. The District Court erred by concluding that an MCDCA claim can only be asserted against a collector that attempts to collect an obligation that it does not own or when a debtor alleges that he or she does not owe the debt. This is too narrow an interpretation of the statute, which is remedial in nature and is to be construed broadly.

The Amended Complaint alleges that Midland has adopted a business model whereby it buys large numbers of charged off consumer accounts for pennies on the dollar and then engages in a pattern and practice of abusive, scattershot litigation to collect debts by filing thousands of lawsuits with robo-signed affidavits without first conducting a proper investigation into whether a legal basis

exists for pursuing a claim and without ever obtaining, or intending to obtain, admissible evidence of the existence or amount of such debt. Midland's filings, made without meaningful attorney involvement, further claim that that the alleged purchased debt was subject to a representation or warranty as to collectability and accuracy when in fact no such representations or warranties exist. Through such a system, Midland deceives debtors into voluntary settlements or to fail to appear in court to contest the lawsuit. Midland refused to try the case against Mr. Olson despite his request to proceed to trial and instead continued to file updated requests for greater amounts of prejudgment interest in order to induce a settlement.

## ARGUMENT

### A.   STANDARD OF REVIEW

Mr. Olson appeals an order granting motions to dismiss.

"An order granting dismissal under Rule 12(b)(6) is reviewed de novo taking 'the factual allegations in the complaint as true.'" Monroe v. City of Charlottesville, Va., 579 F.3d 380, 385 (4th Cir. 2009) (quoting Bass v. E.I. DuPont de Nemours & Co., 324 F.3d 761, 764 (4th Cir. 2003)). Questions of statutory construction are also reviewed de novo. Stone v. Instrumental Lab. Co., 591 F.3d 239, 242-43 (4th Cir. 2009).

17

**B.**    <u>**DISCUSSION OF ISSUES**</u>

**1.**    <u>**TIMOTHY OLSON'S FDCPA CLAIMS ARE TIMELY BECAUSE THE STATUTE OF LIMITATIONS DID NOT BEGIN TO RUN UNTIL HE REQUESTED TO WAIVE SERVICE OF PROCESS.**</u>

The District Court ruled that all but one of Mr. Olson's FDCPA claims were barred by the FDCPA's one-year statute of limitations because they related to conduct that occurred more than one year prior to the date the present lawsuit was filed (i.e., conduct occurring before May 20, 2012). JA 86. The District Court explained that "all of Olson's claims founded on the filing of a collection lawsuit against him are time-barred" because the debt collection lawsuit was filed in December 2010, and Mr. Olson had notice of the lawsuit as evidenced by a letter he sent requesting a change of venue and substituted service of a lawsuit filed in Saint Mary's County on a roommate of Mr. Olson's in Baltimore City on February 17, 2012. JA 76, 87.

There is no dispute, however, that the alleged substituted service on the roommate did not trigger the jurisdiction of the District Court of Maryland for Saint Mary's County because that lawsuit was filed in the wrong venue. <u>See</u> Md. Code Ann., Courts & Judicial Proceedings § 6-201(a) (". . . a civil action shall be brought in a county where the defendant resides, carries on a regular business, is employed, or habitually engages in a vocation."). As alleged in the Amended Complaint, Defendants attempted to obtain an affidavit judgment against Mr.

Olson claiming that the substitute service on the alleged roommate on February 17, 2012, established the District Court of Saint Mary County's jurisdiction. This attempt was not effective and the request for affidavit judgment was denied. JA 25-26, ¶ 71. Instead, Midland and MCM and Lyons have repeatedly had the case transferred from one county to another as part of their collection activities. Each time the case was transferred, it effectively began anew with a new summons being issued that needed to be served on Mr. Olson to establish jurisdiction. Thus, to this day Mr. Olson has yet to be served with a summons that actually created jurisdiction to hear the case and provided him with a trial date to dispute the claims being asserted against him by Midland and MCM.

In such a factual setting, the remedial purposes of the FDCPA are best served by treating the transfer of a lawsuit to a new venue as the equivalent of instituting a new debt collection lawsuit for the purposes of measuring the one-year FDCPA statute of limitations because each transfer requires the issuance of a new summons and new service upon the consumer. This is consistent with the approach adopted in Johnson v. Riddle, 305 F.3d 1107, 1111 (10th Cir. 2002) ("We hold that, where the plaintiff's FDCPA claim arises from the instigation of a debt collection suit, the plaintiff does not have a 'complete and present cause of action,' . . ., and thus no violation occurs within the meaning of § 1692k(d), until the plaintiff has been served."). In that case, the Court recognized that measuring the

19

limitations period for a claim based upon the filing of a lawsuit from the date of filing, rather than the date of service, would mean that a debt collector could insulate itself from an FDCPA lawsuit by filing an illegal lawsuit and then waiting, like in this case, more than one year to serve the lawsuit. Mr. Olson's claim in this case was not complete at the earliest until he attempted to waive improper service on August 22, 2012, because up to that point, Defendants could have amended their debt collection lawsuit or voluntarily dismissed it or unilaterally moved to transfer it to another county so as not to commit a violation of the FDCPA. Mr. Olson's FDCPA claims based upon the debt collection lawsuit did not become complete until he was served a lawsuit brought in the proper venue because until that happened no court could exercise jurisdiction over the dispute.

Under this approach, the earliest date the FDCPA limitations period would have started to run is August 22, 2012, when Mr. Olson appeared in District Court in Baltimore City and acknowledged that he was prepared to proceed to trial, thereby waiving any defense based upon improper service. JA 23 at ¶ 62. There is no dispute that Mr. Olson filed his FDCPA claims within one year of that date.

In the proceedings below, Defendants argued that because they had been collecting the debt for more than a year before Mr. Olson's lawsuit was filed, all of their FDCPA violations are time-barred, even later violations occurring within one year before the filing of the FDCPA complaint. The District Court correctly

rejected this argument because it has been consistently rejected by Courts that have considered it. See, e.g., Malik v. Unifund CCR Partners, C09-1389 MJP, 2009 WL 5197820, at *5 (W.D. Wash. Dec. 22, 2009); Ehrich v. RJM Acquisitions LLC, 09 CIV. 2696 BMC/RER, 2009 WL 4545179, at *2 (E.D.N.Y. Dec. 4, 2009); Alston v. Cavalry Portfolio Servs., LLC, 8:12-CV-03589-AW, 2013 WL 665036, at *4 (D. Md. Feb. 22, 2013).

The Amended Complaint alleges that the FDCPA's one year statute of limitations has been tolled because Defendants have engaged in a continuing course of conduct including several, repeated violations of the FDCPA, some of which fall within the one-year limitations period. JA 28 at ¶ 85. See Tucker v. Mann Bracken, LLC, No. 08–1677, 2009 WL 151669, at *3 (M.D.Pa. Jan.21, 2009). In that case, the defendant sought to dismiss an FDCPA claim because the initial violation occurred more than one year before the plaintiff filed his complaint. The court denied defendant's motion to dismiss, holding that "a continuing violation theory may be applied to FDCPA claims" when such claims stem from a pattern of repeated conduct, some of which falls outside the technical limitations period. Id. In this case, as in Tucker, Plaintiff's FDCPA claims rest on a continuing pattern of behavior by Defendants that began outside the limitations period but continued into it and in fact still continues. In this case, although much of the alleged FDCPA violations relate to the manner in which the debt collection

lawsuit was prepared, this conduct was effectively repeated over and over again each time the lawsuit was transferred from one county to another without amendment by Midland or MCM or any meaningful involvement by its attorney, Lyons.

### 2. DEFENDANTS VIOLATED THE FDCPA BY COMMUNICATING WITH TIMOTHY OLSON AFTER DEFENDANTS KNEW THAT HE WAS REPRESENTED BY COUNSEL.

The District Court recognized that a timely claim existed based upon MCM's sending Mr. Olson a Privacy Notice on May 8, 2013.

The Amended Complaint adequately alleges that MCM violated 15 U.S.C. § 1692c(a)(2) when it communicated with Mr. Olson after Defendants knew he was represented by an attorney with respect to the subject debt and had knowledge of such attorney's name and address. JA 26-27 at ¶¶ 79-81. Despite such knowledge, MCM communicated directly with Mr. Olson on May 8, 2013, by sending him a Privacy Notice that stated that MCM shares his private information with third parties, and provided a link to a website that included a request for payment. Id.; JA 42-43.

Under 15 U.S.C. § 1692c(a)(2), after a debt collector knows that the consumer is represented by an attorney "with regard to the subject debt," the debt collector shall not "communicate with a consumer in connection with the collection" of the debt. Once a collector has learned that the consumer is

represented by an attorney, the collector must deal exclusively with the attorney and may not contact the consumer for any reason. See, e.g., Valdez v. Capital Mgmt. Servs., LP, CIV.A. B:09-246, 2010 WL 4643272, at *11 (S.D. Tex. Nov. 16, 2010).

In granting the motion to dismiss, the District Court applied the three factor test recognized by the Sixth Circuit and Seventh Circuit as well as some District Courts in the Fourth Circuit. Under this approach, "[i]n determining whether a communication is intended to collect a payment, it is appropriate to consider the nature of the parties' relationship, as well as the purpose and context of the communication and whether an "animating purpose" of the communication is to induce payment. Penn v. Cumberland, 883 F. Supp. 2d 581, 587-88 (E.D. Va. 2012), quoting Grden v. Leikin Ingber & Winters PC, 643 F.3d 169, 173 (6th Cir.2011); Gburek v. Litton Loan Servicing LP, 614 F.3d 380, 384–385 (7th Cir.2010).[1]

In applying these factors, the District Court ruled that "[a]lthough the

---

[1] Other courts have included additional factors. See McDermott v. Randall S. Miller & Associates, P.C., 835 F. Supp. 2d 362, 370-71 (E.D. Mich. 2011) (including as factors whether the communication: "(1) contains a demand for payment; (2) is from a debt collector; (3) demands payment or states a balance due; (4) states that it is an attempt to collect a debt; (5) threatens consequences if the plaintiff does not pay; (6) was sent in response to an inquiry or request from the plaintiff; (7) states that the sender is not authorized to accept payment; and (8) is part of a strategy to make payment more likely or was made to induce the debtor to settle his or her debt.").

relationship between Olson and Midland militates in favor of finding the privacy notice at issue here to be a communication made in connection with collection, the notice does not appear to have the animating purpose of inducing payment, nor does the purpose and context of the notice connect it to debt collation." JA 91. This ruling should be reversed because the "animating purpose" test is not supported by the plain language of the statute and, even if it were, the application of the factors does not warrant dismissal and raised several questions of fact that should have been resolved by a jury and not at the motion to dismiss stage.

> ### a.    The "Animating Purpose" Test Adopted by the District Court Is Not Supported by the Plain Meaning of the FDCPA.

The animating purpose and connection to debt collection factors find no support in the plain language of 15 U.S.C. § 1692c(a)(2) which unambiguously identifies the circumstances when "a debt collector may not communicate with a consumer in connection with the collection of any debt." As recently reinforced in Clark v. Absolute Collection Serv., Inc., 13-1151, 2014 WL 341943 (4th Cir. 2014), when interpreting a statue, the inquiry begins, and often ends, with the language of the statute because "when the statute's language is plain, the sole function of the courts — at least where the disposition required by the text is not absurd — is to enforce it according to its terms." Clark, 2014 WL 341943, at *2 (quoting Lamie v. U.S. Tr., 540 U.S. 526, 534 (internal quotation marks omitted)).

The plain language of the FDCPA requires that communications with consumers be "in connection with the collection of the debt." 15 U.S.C. § 1692c (a); see also 15 U.S.C. § 1692e; 15 U.S.C. § 1692g. The plain language requires only that the communication with the consumer be "in connection with the collection of the debt" and this language is not limited to communications that include explicit demands for payment. Had Congress intended to further limit the protections provided by § 1692c(a)(2) it could have done so by using limiting language similar to the following language used in 15 U.S.C. § 1692g(e):

> (e) Notice provisions
>
> The sending or delivery of any form or notice which does not relate to the collection of a debt and is expressly required by Title 26, title V of Gramm-Leach-Bliley Act [15 U.S.C.A. § 6801 et seq.], or any provision of Federal or State law relating to notice of data security breach or privacy, or any regulation prescribed under any such provision of law, shall not be treated as an initial communication in connection with debt collection for purposes of this section.

15 U.S.C. § 1692g(e). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Clark, 2014 WL 341943, at *2 (4th Cir. 2014) (quoting Russello v. United States, 464 U.S. 16, 23, 104 S.Ct. 296, 78 L.Ed.2d 17 (1983) (internal quotation marks omitted)).

The animating purpose and connection to debt collection factors do not

advance the legislative goals of the FDCPA. In analyzing the FDCPA, courts apply a "least sophisticated consumer" standard "to ensure that the FDCPA protects all consumers, the gullible as well as the shrewd." United States v. Nat'l Fin. Services, Inc., 98 F.3d 131, 136 (4th Cir. 1996). The Seventh Circuit has noted that:

> Literally, the least sophisticated consumer is not merely "below average," he is the very last rung on the sophistication ladder. Stated another way, he is the single most unsophisticated consumer who exists. Even assuming that he would be willing to do so, such a consumer would likely not be able to read a collection notice with care (or at all), let alone interpret it in a reasonable fashion. Courts which use the "least sophisticated consumer" test, however, routinely blend in the element of reasonableness.

Gammon v. GC Servs., 27 F.3d 1254, 1257 (7th Cir. 1994). The FDCPA is a remedial statute, construed liberally in favor of the debtor; see also Sprinkle v. SB&C, Ltd., 472 F. Supp. 2d 1235, 1246 (W.D. Wash. 2006). Also, the FDCPA seeks to insure that those debt collectors who refrain from using abusive debt collection practices are not competitively disadvantaged. 15 U.S.C § 1692(e).

Given this remedial structure, this Court should not recognize the additional factors added by the District Court. These additional factors cause a court's analysis to resemble more of a balancing test than a bright-line rule. A bright-line rule that looks directly at the relationship between the consumer and the debt collector, subject to certain narrow exceptions, better protects the least sophisticated consumer and also better protects legitimate debt collectors who wish to refrain from illegal conduct by providing clear guidance.

In this case the District Court conceded that the only relationship between MCM and Mr. Olson was that MCM was actively attempting to collect a debt from Mr. Olson. But for this relationship, MCM would have had no reason to send any communication to Mr. Olson. Since the business of MCM is the collection of debts allegedly owed by consumers, the underlying purpose of every communication sent by MCM to consumers is the collection of debts allegedly purchased by Midland. This is illustrated by the language used in the Privacy Notice. The notice explained that there were circumstances when it would "use and disclos[e] [a consumer's] nonpublic personal information" to third parties, which could be potentially financially damaging and embarrassing to the consumer. JA 26-27 at ¶ 80, JA 43. Under the plain language of the statute, the relationship between the debtor and debt collector is the only factor that should have been considered because when the only relationship between MCM and Mr. Olson arises from debt collection, all communications with Mr. Olson are either directly or indirectly "in connection with the collection of any debt."

The District Court placed great weight on the fact that the communication did not make specific reference to Mr. Olson's debt even though there is no legitimate dispute that the notice would not have been sent to Mr. Olson had there not been such a debt. The failure to include a specific reference to the debt does not make the communication any less intrusive or harassing or improper because the

consumer knows as soon as he or she receives the envelope that the communication is from a debt collector who will likely continue to hound the consumer until a payment arrangement is made. To protect consumers from this type of unfair harassment, the FDCPA prohibits debt collectors from communicating with consumers represented by attorneys and requires instead that the communications be sent to the consumer's attorney, which is what should have happened in this case.

The District Court also downplayed the "make a payment" link contained on the web page that consumers like Mr. Olson were directed to by the notice, concluding that this link was not a communication in connection with the collection of a debt because it was "merely offering a website visitor the opportunity to pay" but was "not a demand or inducement to pay an overdue debt." JA 93.

Congress did not intend for the Courts to draw such fine distinctions between whether providing an ability to make an online payment is less harassing than including words demanding a payment. Instead, Congress was clear that when a consumer is represented by an attorney, the debt collector is to stop communicating with the consumer in any manner.

In reaching its decision, the District Court explained "[t]o hold otherwise, on the basis of the relationship alone, would mean any time a debt collector

communicated with a debtor the communication would be subject to regulation under the FDCPA, an outcome not contemplated by the statute." JA 86 (citing Grden and Gburek.). The District Court's concern is blown out of proportion because it is hard to imagine why a debt collector would ever need to communicate with a consumer other than at least indirectly to encourage a payment on the account. If, as in this case, the only relationship between the parties is a relationship between a "debt collector" and a "debtor" there can be no other reasonable conclusion but that the communication from the debt collector was sent in connection in collecting the debt especially when the communication states the consumer's nonpublic personal information would be disclosed to third parties and directs the consumer to a webpage that provides a mechanism to make a payment.

### b. The Privacy Notice Is a Communication in Connection with the Collection of a Debt Under the "Animating Purpose" Test.

Even if the three factor test is adopted by the Fourth Circuit, the "animating purpose" of the privacy notice is to collect a debt. The District Court overlooked the most important part of the test, which is "the nature of the parties' relationship" which "weighs in favor of finding that a communication was made 'in connection with' the collection of a debt when the only relationship the defendant has with the plaintiff arises out of the plaintiff's defaulted debt." Johnson v. Brock & Scott, PLLC, No. 5:11-CV-474-F, 2012 WL 4483916, at *15 (E.D. N.C. 2012) (quoting

McDermott, 835 F.Supp. at 370; Gburek, 614 F.3d at 385). With respect to Mr. Olson and MCM, "the sole relationship between Plaintiff and Defendant is that of debtor and debt collector, which itself supports the Plaintiff's position that the communications have been 'in connection with' the collection of a debt." Id. at *16 (citing Gburek, 614 F.3d at 385).

The District Court also erred because "[a] communication need not itself be a collection attempt; it need only be 'connect[ed] with one . . . an 'explicit demand for payment' is not always necessary for the statue to apply." Grden, 643 F.3d at 173 (citing Gburek, 614 F. 3d at 385). As the Grden court noted, "[o]bviously communications that expressly demand payment will almost certainly have this purpose. But so too might a communication that merely refers the debtor to some other communication that itself demands payment." Id. This is precisely what occurred here because the communication directed Mr. Olson to a web site that prominently provided Mr. Olson the ability to make a payment online.

The three-factor test should be construed as setting a low bar to meet because the least sophisticated consumer standard is remedial and should be construed liberally in favor of the debt. Proof of actual deception of the consumer bringing the FDCPA claim is not required or relevant to the determination of a collector's liability. The least sophisticated consumer standard is objective, not subjective. See, e.g., Avila v. Rubin, 84 F.3d 222, 227 (7th Cir. 1996). In addition,

truth is not a defense to a claim of deception and partial truths and ambiguous statements are deceptive if the statement is subject to an interpretation or contains an implication with the capacity to deceive. See Rosenau v. Unifund Corp., 539 F.3d 218, 222 (3d Cir. 2008) ("A debt collection letter is deceptive where it can be reasonably read to have two or more different meanings, one of which is inaccurate"); Drennan v. Van Ru Credit Corp., 950 F. Supp. 858 (N.D. Ill. 1996) (claim stated where unsophisticated consumer could interpret defendant's "legal review notification" and "notice of possible wage garnishment," despite frequent use of "may" and "might," as imminent threats when in fact no action was taken for over year after dunning letters were sent). As the Supreme Court has held in the general context of consumer protection, "it does not seem 'unfair to require that one who deliberately goes perilously close to an area of proscribed conduct shall take the risk that he may cross the line.'" FTC v. Colgate-Palmolive Co., 380 U.S. 374, 393, 85 S. Ct. 1035, 1047, 13 L.Ed.2d 904 (1965) (quoting Boyce Motor Lines, Inc. v. U.S., 342 U.S. 337, 340, 72 S.Ct. 329, 330-31, 96 L.Ed. 367 (1952)).

Construed liberally in favor of the least sophisticated consumer, the privacy notice sent by MCM to Mr. Olson provides an animating purpose to induce payment by informing Mr. Olson that MCM shares his private information in the course of its debt collection conduct. The notice is vaguely worded about the type of "nonpublic personal information" (translation: private information) that is

collected. It states that MCM collects "other relevant information" that the consumer provides, "information we receive about your account transactions with us, our affiliates, or others," and "other information relating to your creditworthiness." JA 43. Though more specific examples are provided, the collection is not limited to these examples, but rather the examples are some things that MCM "may include." Id.

The privacy notice further provides a subtle threat that as long as MCM is "servicing" Mr. Olson's debt, MCM may share his private personal information with third parties "to the extent necessary to aid us in servicing or managing your accounts in the ordinary course of our business." Id. Again, though MCM provides examples of some things that are in the ordinary course of its business, such as sharing the private information with service providers that help administer MCM's database, it does not limit its ability to make further disclosures. Id. Since this phrase is vague, it provides little reassurance to the consumer that his or her private information is safe with MCM, but rather provides a subtle threat that the private information might be shared "to the extent necessary to aid" MCM in MCM's debt collection activities, which are the "ordinary course of" MCM's business. Translation: MCM might disclose the consumer's private information if MCM believes it will help MCM collect the debt.

In fact, at least one court has refused to grant a motion to dismiss for an

FDCPA claim arising out of a stand alone privacy notice:

> [T]he fact the letter is a privacy notice does not, as a matter of law, eliminate its status as a communication made in connection with debt collection under the FDCPA. Further despite a letter's overriding intent of notification of privacy rights, it could also have the effect of leading an unsophisticated, but reasonable consumer to believe the debt collector sent the communication in connection with the collection of a debt.

Stricklin v. Jefferson Capital Systems, LLC, 11-cv-201-DRH, 2011 WL 5325735, at *7 (S.D. Ill. Nov. 3, 2011) (denying debt collector's motion to dismiss). The District Court erroneously cited Stricklin in support of its conclusion, but Stricklin provides persuasive authority for Mr. Olson. JA 92.

The District Court engaged in further unwarranted distinctions with respect to the notice's referral of the debtor to a website that includes a request for payment. JA 43, 44. Specifically, MCM's Privacy Notice directs consumers to visit www.mcmprivacy.com. This web page directs consumers to call MCM with any questions and provides a link  consumers to make a payment online. JA 27 at ¶ 81; JA 44. In addition to repeating the language from the mailed notice verbatim, the online Privacy Notice includes the following disclosure "Please understand that this is a communication from a debt collector. This is an attempt to collect a debt. Any information obtained will be used for that purpose." Id. The Court distinguished that "the 'Make a Payment' link does not demand payment . . . Merely offering a website visitor the opportunity to pay, in the the top toolbar of

the page, is not a demand or inducement to pay an overdue debt." JA 93. Thus, the printed Privacy Notice directed consumers to visit the webpage where MCM clearly states that its Privacy Notice is a communication from a debt collector attempting to collect a debt and where MCM encourages consumers to make a payment online. From the perspective of the least sophisticated debtor who has just been told that certain of his or her unknown private information might be shared with third parties to assist in debt collection, providing an ability to "make a payment" is plainly a collection attempt.

At the very least, the resolution of the factors would necessarily be a question of fact for the jury to resolve. This is illustrated in <u>Hernandez v. Midland Credit Mgmt., Inc.</u>, 04 C 7844, 2006 WL 695451 (N.D. Ill. Mar. 14, 2006), where the court considered whether MCM's ultimate corporate parent, Encore Capital, was a debt collector based upon the fact that it joined in providing the same type of Privacy Notice at issue in this case. Plaintiff moved for judgment on the pleadings based on the theory that the privacy notice, sent on behalf of Defendant MCM, was part of Defendant MCM's debt collection effort because a debtor might be induced to pay on the delinquent claim so as to avoid the potentially financially damaging and embarrassing disclosures to third parties threatened in the notice. <u>Id</u>. at *6. Although the Court ruled that it could not grant the motion at that stage of the proceedings, it recognized that the Plaintiff's claim was essentially a plausible one.

Drawing parallels to a case involving Western Union "Talking Telegrams," Romine v. Diversified Collection Servs., Inc., 155 F.3d 1142 (9th Cir. 1998), the Court held that "it is possible that Defendant Encore's inclusion of the privacy notice with Defendant MCM's dunning letter amounts to an indirect attempt to collect a debt." Id.

As demonstrated above, the Amended Complaint included allegations of fact based upon which a reasonable jury could conclude that the animating purpose of the communication was to ultimately induce the consumer to enter into a payment arrangement.

**3. DEFENDANTS VIOLATED THE MCDCA AND MCPA BY USING A STRATEGY AND POLICY OF SCATTERSHOT LITIGATION DESIGNED TO DECEIVE CONSUMERS.**

The Amended Complaint also alleged claims under the MCDCA and MCPA which were timely under the applicable three-year statute of limitations. See Md. Cts. & Jud. Proc. Code Ann. § 5-101 ("A civil action at law shall be filed within three years from the date it accrues unless another provision of the Code provides a different period of time within which an action shall be commenced.").

The MCDCA prohibits collectors from "claim[ing], attempt[ing], or threaten[ing] to enforce a right with knowledge that the right does not exist." Md. Code Ann., Comm. Law, § 14–202(8). "This has been held to mean that a party may not attempt to enforce a right with actual knowledge or with reckless

disregard as to the falsity of the existence of the right." Kouabo v. Chevy Chase Bank, F.S.B., 336 F. Supp. 2d 471, 475 (D. Md. 2004) (citing Spencer v. Hendersen–Webb, Inc., 81 F.Supp.2d 582, 594–95 (D. Md.1999)). The MCPA prohibits "unfair or deceptive trade practices," Md.Code Ann., Com. Law § 13-301, and expressly designates as "unfair or deceptive trade practices" those that constitute any violation of the MCDCA. Id. § 13-301(14)(iii).

The District Court erred by concluding that an MCDCA claim can only be asserted against a collector that attempts to collect an obligation that it does not own, that the debtor does not owe, or is barred by the statute of limitations.[2] This is too narrow an interpretation of the statute, which is remedial in nature and is to be construed broadly.

The Amended Complaint alleges that Midland has adopted a business model whereby it buys large numbers of charged off consumer accounts for pennies on the dollar and then engages in a pattern and practice of abusive, scattershot litigation to collect debts by filing thousands of lawsuits without first conducting a proper investigation into whether a legal basis exists for pursuing a claim and without ever obtaining, or intending to obtain, admissible evidence of the existence or amount of the debt. JA 13-14 at ¶¶ 32-34. The lawsuits are filed with robo-

---

[2] Mr. Olson did allege that Midland did not own the debt (and therefore did not owe a debt to Midland) to the extent it lacked admissible evidence of its ownership. JA 20 at ¶ 50.

signed affidavits from Midland, made without meaningful attorney involvement, and claim to be subject to representations and warranties. This system deceives consumers into either failing to appear at trial or to enter into a voluntary settlement with Midland.

During 2012, for example, Defendants filed 7,625 lawsuits in the state District Court of Maryland. JA 9 at ¶ 15. The attorney who signed the complaint filed against Mr. Olson was also the attorney of record for approximately 11,668 cases filed in 2012, including signing approximately 1,893 other complaints the same month as Mr. Olson's. JA 26 at 78; 22 at 58.

In Mr. Olson's case, there is no dispute that the District Court of Maryland for St. Mary's County denied affidavit judgment against Midland, and thus Midland was unable to establish that it owned the debt or that the amount claimed was accurate. JA 25 at ¶ 71; JA 26 at 78.[3] After denial of the affidavit judgment, the lawsuit was set for a default hearing. JA 78. In fact, Midland refused to try the case despite Mr. Olson's numerous requests, but rather repeatedly sent him increasingly greater prejudgment interest requests in an attempt to induce a settlement. JA 23-26 at ¶¶ 62-77. These allegations, which the District Court was required to accept as true, allowed the District Court to draw the reasonable

---

[3] The reasons why Midland's documentation could not establish its claim are set forth in the Amended Complaint at JA 19-23 at ¶¶ 47-61.

inference that the Defendants acted with reckless disregard as to the falsity of whether they had the right to actually collect the debt that was the subject of their debt collection lawsuit.

In addition, the alleged deceptive conduct includes filing lawsuits with sworn affidavits containing false, deceptive, and misleading statements by individuals without personal knowledge. JA 14-15 at ¶¶ 35-37. This system has been in place for several years. One Federal Court has noted that one of Midland's "specialists" personally signs between 200 and 400 affidavits per day. Midland Funding LLC v. Brent, 644 F. Supp. 2d 961, 966-67 (N.D. Ohio 2009). As the court found, "[h]e finds the stack on the printer, signs them, and sends them by internal mail to the notary" and though he has the ability to check the accuracy of the information contained in the affidavit on the computer system, "the percentage of those that are checked for accuracy is 'very few and far between.'" Id. at 967 ("Q: Where do your affidavits come from? A: As far as what I deal with, they just come from the printer as far as where we get them.").

In December 2012, the Minnesota Office of the Attorney General obtained a consent judgment in regard to the business practices of Midland. See Press Release: Attorney General Lori Swanson Obtains Consent Judgment in "Robo-Signing" Lawsuit Against One of County's Largest Debt Buyers, available at: http://www.ag.state.mn.us/Consumer/PressRelease/121212DebtBuyers.asp.    The

Minnesota OAG noted that Midland affiants signed up to 400 affidavits per day, "either without reading them, without personal knowledge of their contents, and/or without verifying the accuracy of the information contained in them." Id. The affiants even lacked knowledge of the company's ownership of the debt, the amount of the debt, and the documents giving rise to the debt. Id. The affidavits were filed even though the underlying documentation did not support Midland's ownership. Id. Defendants do not contest these factual assertions in their Motion to Dismiss.

Numerous courts have begun to recognize that the scattershot litigation approach is inherently deceptive. For example, the Central District of California has noted that "[p]laintiff claims that GSFC engaged in a pattern and practice of filing debt collection suits without ever obtaining, or intending to obtain, admissible evidence of the existence or amount of such debts . . . GSFC's pattern and practice, and improper motive, combine to create a deceptive practice prohibited by FDCPA." Mello v. Great Seneca Fin. Corp., 526 F. Supp. 2d 1020, 1023 (C.D. Cal. 2007). The Northern District of Georgia referenced a debt buyer's "pattern and practice of abusive, scattershot litigation to collect debts." Kuria v. Palisades Acquisition XVI, LLC, 752 F. Supp. 2d 1293, 1302 (N.D. Ga. 2010); see also Kamps v. Midland Funding LLC, 2:12-cv-3799-KOB, 2013 WL 622505, at *1 (N.D. Ala. Feb. 19, 2013) ("as part of a strategy and policy of scattershot litigation

designed to sue Alabama consumers who do not owe the debt to Defendant Midland in order to coerce or deceive the Alabama consumers into paying a debt not owed or to receive a judgment against consumers."). Similarly, the Eastern District of Tennessee found persuasive that:

> [Defendants'] acts were part of a larger business model -- that is they were engaged in a "pattern and practice" -- in which they intentionally decided that, if the collection was challenged by a consumer, they would not obtain "competent evidence of the alleged debt;" would not engage in a reasonable or adequate investigation prior to filing the lawsuit; would use sworn affidavits containing false, deceptive, and misleading statements by individuals without personal knowledge; and would act with the intent of obtaining default judgments with respect to 95% or more of consumers.

Robinson v. Sherman Fin. Group, LLC, 2:12-cv-30, 2013 WL 1249567, at *7 (E.D. Tenn. March 27, 2013); see also Simmons v. Portfolio Recovery Associates, 3:11-cv-280, 2012 WL 222935, at *4 (E.D. Tenn. Jan. 25, 2012); Samuels v. Midland Funding, LLC, 12-0490-WS-C, 2013 WL 466386, at *1 (S.D. Ala. Feb. 7, 2013); Vinson v. Midland Funding, LLC, 2:12-CV-04187-VEH, 2013 WL 625111 (N.D. Ala. Feb. 20, 2013).

The Amended Complaint alleges that Defendants have hailed thousands of consumers into court in a year in cases where they lacked the type of admissible evidence necessary to prove ownership and validity of the debt and where no reasonable investigation was conducted prior to the filing of the lawsuit and where there has been no meaningful attorney involvement. The Amended Complaint also

alleges that Defendants have intentionally refused to bring the case to a head by striking service when they realized they could not prevail at a trial. These factual allegations state a plausible claim that Defendants attempted to enforce a right to collect on the subject debt with actual knowledge or with reckless disregard as to the falsity of the existence of the right.

## CONCLUSION

For the reasons stated, Mr. Olson requests that the Court of Appeals reverse the order of the District Court dismissing his claims with prejudice and remand the case to the District of Maryland.

## REQUEST FOR ORAL ARGUMENT

Mr. Olson requests oral argument because the District Court's rulings involve questions of first impression relating to the application of the FDCPA's one-year statute of limitations and the factors to be applied in determining whether a communication is "in connection with the collection" of the debt.

Respectfully Submitted,


/s/ E. David Hoskins
E. David Hoskins
The Law Offices of E. David Hoskins, LLC
16 E. Lombard Street, Suite 400
Baltimore, Maryland 21202
Counsel for Appellant

41

Max F. Brauer
The Law Offices of E. David Hoskins, LLC
16 E. Lombard Street, Suite 400
Baltimore, Maryland 21202
Counsel for Appellant

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that:

1. This brief has been prepared with Word, using a proportionally spaced serif typeface, Times New Roman, 14 point font.

2. Exclusive of: table of contents; table of authorities; any addendum containing statutes, rules, or regulations; and the certificate of service this brief contains <u>10,227</u> words.

3. I understand that a material misrepresentation can result in the Court's striking the brief and imposing sanctions.  If the Court so directs, I will provide an electronic version of the brief and/or copy of the word or line printout.

*/s/ E. David Hoskins*
E. David Hoskins
The Law Offices of E. David Hoskins, LLC
16 E. Lombard Street, Suite 400
Baltimore, Maryland 21202
*Counsel for Appellant*

Max F. Brauer
The Law Offices of E. David Hoskins, LLC
16 E. Lombard Street, Suite 400
Baltimore, Maryland 21202
*Counsel for Appellant*

## <u>CERTIFICATE OF FILING AND SERVICE</u>

On the 21st day of February, 2014, I filed the required copies of the foregoing OPENING BRIEF OF APPELLANT with the Clerk of Court via hand delivery and electronically using the CM/ECF system, which will send a notice of electronic filing to:

James P. Ulwick
Amy E. Askew
KRAMON & GRAHAM, PA
Suite 2600, Commerce Place
1 South Street
Baltimore, MD 21202
julwick@kg-law.com
aaskew@kg-law.com
*Counsel for Appellees*
*Midland Funding LLC and*
*Midland Credit Management Inc*

Ronald S. Canter
LAW OFFICES OF
RONALD S. CANTER, LLC
200A Monroe Street, Suite 104
Rockville, MD 20850
rcanter@roncanterllc.com
*Counsel for Appellee*
*Lyons Doughty & Veldhuis, P.C.*

*/s/ E. David Hoskins*
E. David Hoskins
The Law Offices of E. David Hoskins, LLC
16 E. Lombard Street, Suite 400
Baltimore, Maryland 21204

Max F. Brauer
The Law Offices of E. David Hoskins, LLC
16 E. Lombard Street, Suite 400
Baltimore, Maryland 21204
*Counsel for Appellant*

## ADDENDUM SETTING FORTH RELEVANT PORTIONS OF STATUES

## 15 U.S.C. § 1692a

(3) The term "consumer" means any natural person obligated or allegedly obligated to pay any debt.

\*      \*      \*

(6) The term "debt collector" means any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the collection of any debts, or who regularly collects or attempts to collect, directly or indirectly, debts owed or due or asserted to be owed or due another. Notwithstanding the exclusion provided by clause (F) of the last sentence of this paragraph, the term includes any creditor who, in the process of collecting his own debts, uses any name other than his own which would indicate that a third person is collecting or attempting to collect such debts. For the purpose of section 1692f(6) of this title, such term also includes any person who uses any instrumentality of interstate commerce or the mails in any business the principal purpose of which is the enforcement of security interests. The term does not include--

(A) any officer or employee of a creditor while, in the name of the creditor, collecting debts for such creditor;

(B) any person while acting as a debt collector for another person, both of whom are related by common ownership or affiliated by corporate control, if the person acting as a debt collector does so only for persons to whom it is so related or affiliated and if the principal business of such person is not the collection of debts;

(C) any officer or employee of the United States or any State to the extent that collecting or attempting to collect any debt is in the performance of his official duties;

(D) any person while serving or attempting to serve legal process on any other person in connection with the judicial enforcement of any debt;

(E) any nonprofit organization which, at the request of consumers, performs bona fide consumer credit counseling and assists consumers in the liquidation of their debts by receiving payments from such consumers and distributing such amounts to creditors; and

(F) any person collecting or attempting to collect any debt owed or due or asserted to be owed or due another to the extent such activity (i) is incidental to a bona fide fiduciary obligation or a bona fide escrow arrangement; (ii) concerns a debt which was originated by such person; (iii) concerns a debt which was not in default at the time it was obtained by such person; or (iv) concerns a debt obtained by such person as a secured party in a commercial credit transaction involving the creditor.

## 15 U.S.C. § 1692c

(a)    Communication with the consumer generally.

Without the prior consent of the consumer given directly to the debt collector or the express permission of a court of competent jurisdiction, a debt collector may not communicate with a consumer in connection with the collection of any debt—

\*      \*      \*

(2)    if the debt collector knows the consumer is represented by an attorney with respect to such debt and has knowledge of, or can readily ascertain, such attorney's name and address, unless the attorney fails to respond within a reasonable period of time to a communication from the debt collector or unless the attorney consents to direct communication with the consumer. . . .

## 15 U.S.C. § 1692g

(e)    Notice provisions

The sending or delivery of any form or notice which does not relate to the collection of a debt and is expressly required by Title 26, title V of Gramm-Leach-Bliley Act [15 U.S.C.A. § 6801 et seq.], or any provision of Federal or State law relating to notice of data security breach or privacy, or any regulation prescribed under any such provision of law, shall not be treated as an initial communication in connection with debt collection for purposes of this section.

## 15 U.S.C. § 1692k

(d)    Jurisdiction

An action to enforce any liability created by this subchapter may be brought in any appropriate United States district court without regard to the amount in controversy, or in any other court of competent jurisdiction, within one year from the date on which the violation occurs.

## Md. Code, Commercial Law, § 13-101

Unfair or deceptive trade practices include any:

(1)    False, falsely disparaging, or misleading oral or written statement, visual description, or other representation of any kind which has the capacity, tendency, or effect of deceiving or misleading consumers;

\*        \*        \*

(14)    Violation of a provision of:

\*        \*        \*

        (iii) Title 14, Subtitle 2 of this article, the Maryland Consumer Debt Collection Act;

## Md. Code, Commercial Law, § 14-201

a)    In this subtitle the following words have the meanings indicated
.
(b)    "Collector" means a person collecting or attempting to collect an alleged debt arising out of a consumer transaction.

(c)    "Consumer transaction" means any transaction involving a person seeking or acquiring real or personal property, services, money, or credit for personal, family, or household purposes.

(d)    "Person" includes an individual, corporation, business trust, statutory trust, estate, trust, partnership, association, two or more persons having a joint or common interest, or any other legal or commercial entity.

46

## **Md. Code, Commercial Law, § 14-202**

In collecting or attempting to collect an alleged debt a collector may not:

\*       \*       \*

    (8)    Claim, attempt, or threaten to enforce a right with knowledge that the right does not exist; or